[No. H016022. Sixth Dist. Oct. 23, 1998.]

ROBERT MEISTER, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

438

## COUNSEL

Dawson, Passafuime & Bowden, Gerald D. Bowden, Rosen, Bien & Asaro, William H. D. Fernholz and Sanford Jay Rosen for Plaintiff and Appellant.

James E. Holst, John F. Lundberg, David M. Birnbaum, Grunsky, Ebey, Farrar & Howell, Dennis P. Howell, Greines, Martin, Stein & Richland, Martin Stein, Timothy T. Coates and Alison M. Turner for Defendants and Respondents.

## OPINION

**MIHARA, J.**—Plaintiff prevailed in a civil action against defendants. He recovered $25,000 in noneconomic damages and $2,500 in punitive damages and obtained an injunction. The court also awarded him his "reasonable attorney's fees." However, the court's calculation of "reasonable attorney's fees" yielded but a small fraction of the total amount plaintiff had been charged by his attorneys. In this appeal, plaintiff challenges the trial court's methodology in arriving at this amount. We affirm.

### BACKGROUND

On January 9, 1991, defendant Gary Lease, the dean of humanities at the University of California at Santa Cruz (hereafter UCSC), sent a copy of a "Humanities Division Six-Year Academic Plan" (Plan) to chairpersons of

the boards, committees and programs within the humanities division. This Plan was stamped "confidential." Plaintiff, the coordinator of the legal studies program (hereafter LS), received a copy of this document. The "Plan" contained Lease's recommendation that LS be essentially abandoned. On January 13, 1991, plaintiff circulated a copy of the Plan to the faculty members who taught in LS.

On February 5, 1991, Lease sent a letter to plaintiff in which Lease asserted that plaintiff's circulation of the Plan was "a violation both of divisional confidentiality and of the confidentiality enjoyed by your Humanities chair colleagues." Lease stated that "[a]fter this action, I find it impossible to maintain the necessary confidence in you as Coordinator of the Legal Studies Program." He dismissed plaintiff as coordinator of LS "effective immediately." Lease sent copies of this letter to a host of faculty members, including every member of the faculty who taught in LS, and to plaintiff's personnel file. Lease subsequently restated the content of his letter to the UCSC newspaper. In March 1991 and again in May 1991, Lease circulated a "Legal Studies Program - Chronology" to all faculty teaching in LS. This "Chronology" repeated the statements made by Lease in his letter to plaintiff.

Plaintiff immediately protested Lease's circulation of the February 5 letter. He expressly stated that he was not contesting his termination as LS coordinator. He addressed his protest to Michael Tanner, UCSC's academic vice-chancellor.[1] Tanner referred the matter to the UCSC "Charges Committee" (Committee). In February 1992, the Committee issued a report to Tanner finding that Lease had violated the faculty code of conduct by circulating the letter and the "Chronology." The Committee recommended that Lease be disciplined with a letter of censure. Tanner accepted the Committee's report and recommended to the chancellor that Lease be censured. The chancellor accepted Tanner's recommendation and, on July 13, 1992, sent Lease a formal letter of censure.

Plaintiff retained Attorney Gerald Bowden in January 1993. Plaintiff filed a first amended verified complaint on March 8, 1993 naming as defendants Lease and the Regents of the University of California (hereafter the Regents). He alleged that he had been damaged by Lease's "improper circulation" of the termination letter because the letter contained "personal information" within the meaning of the Information Practices Act of 1977

---

[1] Unbeknownst to plaintiff, Lease had passed the text of his letter by Tanner prior to sending it to plaintiff. However, Tanner had not known or approved of Lease's circulation of the letter to others. Tanner was subsequently absolved of any misconduct. Tanner's involvement was known to plaintiff at the time of the arbitration and was discussed in the arbitration briefs.

(hereafter the IPA). He also claimed that he had been damaged by Lease's statements to the campus newspaper and his republication of the information on subsequent occasions. Plaintiff sought damages for this disclosure under Civil Code section 1798.48. In addition, plaintiff alleged that his termination had been for "constitutionally impermissible reasons and in violation of plaintiff's [federal and state constitutional] rights" and that there had been a conspiracy to deprive him of his civil rights. Plaintiff sought an injunction ordering defendants to (1) "cease conspiring" to deprive him of his civil rights, (2) stop circulating personal information about him, (3) "publicly apologize" for their prior circulation of such information, (4) "establish administrative procedures" that comply with the IPA and (5) "grant plaintiff administrative relief" under the IPA. He also prayed for "general damages in excess of $100,000" and requested attorney's fees and costs.

In the summer of 1993, plaintiff retained Attorney Sanford Jay Rosen and his law firm Rosen, Bien & Asaro to act as "lead counsel" in his lawsuit. In August 1993, Rosen sent a letter to defendants' attorney, David Birnbaum, in which Rosen estimated plaintiff's economic damages at in excess of $200,000. He proposed settlement terms which included a public retraction and apology, disclosure of documents, a pledge by the Regents to cease their "harassment" of plaintiff, a promise of no retaliation, $100,000, promotion of plaintiff to "Professor Step III" and payment of "all attorney's fees and costs incurred" by plaintiff. Plaintiff's then current status was "Professor, Step 1." Alternatively, plaintiff proposed a settlement which included the retraction, apology and pledge without the disclosure or promise but with $500,000, promotion to "Professor, Step V" and payment of all of plaintiff's attorney's fees and costs.

On October 13, 1993, defendants made a formal written offer to settle the action for $15,000 "plus costs and attorneys fees as provided by law, as of October 13, 1993." On November 30, 1993, defendants made a second formal written offer to settle the action. Again, they offered a $15,000 monetary component, "legally recoverable costs" and "reasonable attorneys fees as determined by the court pursuant to CCP § 1033.5, as of November 30, 1993." However, this time defendants also offered to permit an injunction to be entered against them. The proposed injunction would order the Regents to comply with the IPA and remove the offending letter from all UCSC files and order Lease not to violate plaintiff's rights and not to retaliate against plaintiff.

On December 10, 1993, defendants conveyed an oral settlement offer to plaintiff which was a modification of their November 30 written settlement

offer.[2] Defendants substituted an offer of two quarters of paid leave not charged to sabbatical for the $15,000 offered on November 30. The pretax value of this leave was $44,495.54.[3] Defendants also agreed that the injunction would require not only Lease but the Regents also not to retaliate against plaintiff. The conveyance of this settlement offer was acknowledged by plaintiff's attorney, Rosen, in a December 10, 1993, letter to defendants' attorney, Dennis Howell. None of the settlement offers were accepted by plaintiff.

Settlement discussions continued between the parties throughout 1994 and into early 1995. In November 1994, the court ordered the parties to pursue arbitration. An arbitrator was appointed in January 1995. In March 1995, the parties unsuccessfully pursued mediation. A motion to compel production of documents was brought by plaintiff in May 1995. This motion was granted. On June 30, 1995, the parties placed their dispute before an arbitrator. In the arbitration, plaintiff sought damages for lost wages and harm to his reputation and an injunction prohibiting retaliation by defendants, enjoining defendants from violating his rights, and requiring defendants to comply with the IPA. Defendants did not challenge this request for injunctive relief, and they offered to stipulate to such relief.

The arbitrator issued an award in favor of plaintiff. He found that Lease had violated the IPA by circulating the letter, speaking with the campus newspaper and circulating the "Chronology." The arbitrator concluded that plaintiff had suffered no economic loss, but he decided that plaintiff's reputation had been damaged and he had suffered mental distress. He awarded plaintiff $25,000 in noneconomic damages against both Lease and the Regents and $2,500 in punitive damages[4] against Lease alone. The award included an injunction to which defendants stipulated. Defendants were ordered not to "conspire to" or "deprive" plaintiff of his state or federal statutory rights or his state constitutional rights. They were also enjoined from retaliating against plaintiff or publishing personal or confidential information about plaintiff. The arbitrator's amended award provided that "[p]laintiff shall also recover his reasonable attorney's fees and legally recoverable costs from defendants by the filing of a Memorandum of Costs

---

[2]The December 10 offer did not extend the cutoff for attorney's fees and costs. Plaintiff was billed for over $3,000 in attorney's fees and costs between November 30 and the time of the December 10 settlement offer.

[3]The monetary value of the settlement offer was arguably greater than the monetary value of the judgment. Although plaintiff claimed that he was taxed at the highest level, he provided no support for this contention, and the court below resolved the issue against him.

[4]Punitive damages were mandatory under the IPA, and this was the minimum amount awardable.

and pursuant to any appropriate post judgment proceedings taken hereafter." The amended award was filed on August 11, 1995. The parties agreed that neither of them would seek a trial de novo. On August 31, 1995, the parties stipulated to entry of judgment on the amended arbitration award.

On October 20, 1995, plaintiff filed a motion seeking an award of $428,851.17 for his attorney's fees. He subsequently submitted a supplemental claim for $91,735.91 in attorney's fees incurred in the litigation regarding his attorney's fees claim.[5] Plaintiff declared that his "principal goal in this lawsuit" was not damages but instead "public vindication, adequate injunctive relief, documents and public exposure sufficient to prompt institutional reform . . . ." Plaintiff asserted that his lawsuit was responsible for the continuation of LS at UCSC. Plaintiff's attorney, Bowden, declared that plaintiff's "primary objective" was "injunctive relief against future reprisals against him." He also claimed that the discovery of certain documents was critical to plaintiff's "future protection."

Defendants challenged plaintiff's request for this amount of attorney's fees. They asserted that the litigation had not justified such a high level of attorney's fees, and they submitted an expert declaration which maintained that plaintiff's attorneys had "churned" the case so as to extract excessive amounts of attorney's fees. Among other things, defendant's expert asserted that "[n]o sensible client would pay such an amount and few, if any, attorneys would reasonably expect to collect" such an excessive amount of attorney's fees in order to litigate this action. Defendant's expert opined that reasonable attorney's fees should not have amounted to more than "a figure substantially less than $100,000.00."

The trial court appointed a special master "to determine the issue of attorney fees pursuant to C.C.P. Section 639." Defendants asked the special master to reduce the attorney's fees to a " 'reasonable' amount" to "account for [plaintiff's] lack of success, and the immense number of attorney hours unnecessarily spent on this matter." Plaintiff attempted to justify his decision to incur substantial attorney's fees after defendants' December 1993 oral settlement offer. He claimed that his subsequent discovery of additional documents helped to protect him from future retaliation. He also acknowledged that he "always knew that there was a serious risk that I would *not* be reimbursed my attorneys' fees."

The special master issued his report on May 7, 1996. He found that the judgment obtained by plaintiff was less favorable than the December 1993

---

[5]Plaintiff had in fact paid more than $450,000 of the billed attorney's fees, and he was obligated to and expected to pay all of those fees.

oral settlement offer. Although the special master found that plaintiff's "case" was "one factor" motivating reformation of the mechanisms for faculty discipline at UCSC, he decided that "[p]laintiff's case had no catalytic effect that would not have eventuated if he had settled in 1993." The special master's detailed analysis of the attorney's fees claim concluded that the hourly rates charged were reasonable, but the number of hours devoted to the case was unreasonable. He found that the case was "not particularly complex" and that the fees reflected "extravagance." The special master also questioned whether all of the hours charged were "actually spent" on the tasks for which they were billed.

Because the more favorable settlement offer had been made "at a time when the attorney's fees incurred were a small fraction of those ultimately claimed," the special master recommended that the court "exercise its discretion to cut off the attorney's fees as of that date." Alternatively, the special master recommended that the court reduce attorney's fees to $75,000 in its discretion because of the small monetary judgment obtained and the similarity between the injunctive relief offered on December 10, 1993, and the injunctive relief obtained by means of the judgment.

By the time the fee request came before the court nearly $30,000 more was being requested. With a few modifications, the court adopted the special master's report as its statement of decision. It disagreed with the special master's finding that plaintiff's action had been "one factor" in motivating reform of UCSC's faculty disciplinary process. The court found that plaintiff's action had merely motivated "discussion" and "debate" which had already been in progress prior to the action, but his action had not "been a catalyst for change" in any procedures. The court exercised its discretion to limit attorney's fees to those incurred through December 10, 1993. This amounted to $75,500.96. It also found "[i]ndependently and as a separate ground of decision" that "reasonable attorneys' fees" would be in this same amount due to "the very limited success achieved" and the amount of the monetary component of the judgment. Plaintiff filed a timely notice of appeal.

DISCUSSION

A. *Application of the Lodestar Methodology*

California's IPA prohibits the disclosure of "personal information," such as employment history information, by any state agency except under certain circumstances including where the disclosure of the information is "relevant and necessary." (Civ. Code, §§ 1798.3, 1798.24, subd. (d).) The IPA permits

an individual to bring a civil action for damages against a state agency if the agency fails to comply with the IPA and the individual is adversely affected. (Civ. Code, § 1798.45.) Where the information has been disclosed intentionally by a person acting in other than his or her official capacity as a state employee, punitive damages of at least $2,500 are mandatory. (Civ. Code, § 1798.53.) An individual also may obtain injunctive relief for a violation of the IPA. (Civ. Code, § 1798.47.) Attorney's fees are statutorily mandated in successful IPA actions. A successful plaintiff under the IPA is entitled to recover "[t]he costs of the action together with *reasonable* attorney's fees *as determined by the court.*" (Civ. Code, § 1798.48, subd. (b), italics added.)

In this case, defendants did not challenge plaintiff's entitlement to reasonable attorney's fees. They argued only that the amount requested was unreasonable. The trial court agreed, and it awarded an amount which it deemed reasonable. The only question on appeal is whether the trial court's method of calculating the amount of the attorney's fee award was appropriate.

Plaintiff's first contention is that the trial court erroneously failed to follow the "touchstone" or "lodestar" method of calculating a reasonable attorney's fee award.[6] The "touchstone" or "lodestar" method of determining reasonable attorney's fees was endorsed by the California Supreme Court in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]. In

---

[6]Plaintiff argues that the attorney's fee award was based on more than a violation of the IPA. Because the lodestar method of calculating the appropriate attorney's fee award has been accepted as the appropriate method in nearly all state cases, and the federal authorities are not inconsistent on the issues raised herein, we need not decide whether the attorney's fee award was based solely on the IPA. Were we to consider this issue, we would find that the attorney's fee award was based solely on the IPA violation.

The arbitrator's letter to counsel concluded only that Lease had violated the IPA: "Based on my finding of state statutory violations, and due to the constraints of time, I do not reach the issue of whether any federally protected rights were violated." The only relief in the original award was damages for the IPA violation, and this award included attorney's fees. The amended award was also based solely on a violation of the IPA. "Judgment is hereby rendered in favor of plaintiff ROBERT MEISTER and against defendants REGENTS OF THE UNIVERSITY OF CALIFORNIA and GARY LEASE by reason of the defendants' violation of Civil Code Section 1798.24." The stipulated injunctive relief included an order that defendants "[n]ot conspire to or otherwise deprive plaintiff of his rights protected by California Civil Code § 52.1, 42 U.S.C. §§ 1983 and 1985, and Article 1, §§ 1, 2, and 7 of the California Constitution" in addition to an order that defendants comply with the IPA. The amended award provided that "[p]laintiff shall also recover his reasonable attorney's fees and legally recoverable costs from defendants . . . ." Judgment was entered by the trial court on the amended award pursuant to a stipulation by plaintiff and defendants. Because the original award, based solely on the IPA, *included an award of attorney's fees, it is clear that the attorney's fee award was pursuant to the statutory authorization therefor under the IPA rather than under any other legal authority for the award of attorney's fees.

that case, there was no statutory authority for an attorney's fee award,[7] but the California Supreme Court held that an award was proper. The court held that the trial court had properly calculated the award by computing a "touchstone" amount based on "a careful compilation of the time spent and reasonable hourly compensation" and augmenting or diminishing this touchstone amount based on a number of "relevant factors."[8] (*Serrano* at pp. 48-49.) " 'Anchoring the analysis to this [touchstone] concept is the *only way* of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' . . ." (*Serrano* at p. 48, fn. 23, citation omitted, italics added.) None of the "relevant factors" pertinent to augmentation or diminution of the touchstone amount involved a consideration of whether the attorneys had acted reasonably in expending the "time spent" on the litigation. (*Serrano* at p. 49.) The California Supreme Court reiterated the long-standing view that "[t]he 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' . . ." (*Serrano* at p. 49, citations omitted.)

Subsequently, the California Supreme Court added a few refinements to these standards for setting the amount of an attorney's fee award. " '[U]nless special circumstances would render such an award unjust,' " "parties who qualify for a fee should recover for all hours *reasonably spent* . . . .' " (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 633, 639 [186 Cal.Rptr. 754, 652 P.2d 985], italics added.) "A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny

---

[7]Such authority was subsequently enacted by the Legislature. "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest . . . ." (Code Civ. Proc., § 1021.5.)

[8]Most of the factors considered in *Serrano v. Priest* are not relevant here. "Among these factors were: (1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed; and (7) the fact that in the court's view the two law firms involved had approximately an equal share in the success of the litigation." (*Serrano, supra,* 20 Cal.3d at p. 49.) Obviously factor (4) was relevant in the instant matter as a possible justification for diminution of the lodestar amount.

one altogether."[9] (*Serrano v. Unruh, supra*, 32 Cal.3d at p. 635.) The court cited with approval a federal case encouraging a complete denial of fees where the fee request was unreasonably excessive. " 'If . . . the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked in the first place. To discourage such greed, a severer reaction is needful. . . .' " (*Serrano v. Unruh, supra*, 32 Cal.3d at p. 635, citation omitted.)

■ Defendants argue that it was not necessary for the trial court to apply the lodestar method in this case because that method is not applicable to an attorney's fee award under the IPA. "The [California] Supreme Court has never held specifically that trial courts must use the lodestar adjustment method when calculating reasonable fees pursuant to a statute other than section 1021.5 [the private attorney general statute]. But *Serrano III* [*Serrano v. Priest, supra*, 20 Cal.3d 25] itself was not based on any statutory entitlement to fees; instead, it concerned a trial court's equitable power to award reasonable fees. Moreover, its adoption of the lodestar method of calculating reasonable fees was based on the premise that anchoring the analysis to the lodestar figure ' "is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts." ' . . . Thus its pronouncements cannot be read as necessarily limited only to fees awarded under section 1021.5." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 640 [71 Cal.Rptr.2d 632], citations omitted.)[10] ■ We are persuaded by *Flannery* that the California Supreme Court intended its lodestar method to apply to a statutory attorney's

[9]Federal cases are in accord. "In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.' " (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 430, fn. 4 [103 S.Ct. 1933, 1938, 76 L.Ed.2d 40].) "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. . . . Where the documentation of hours is inadequate, the district court may reduce the award accordingly. [¶] The district court also should exclude from this initial fee calculation hours that were not 'reasonably expended.' " (*Hensley* at pp. 433-434 [103 S.Ct. at p. 1939].) "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." (*Hensley* at pp. 436-437 [103 S.Ct. at p. 1941].) "[W]here the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." (*Hensley* at p. 440 [103 S.Ct. at p. 1943].)

[10]*Flannery* rejected reliance on federal standards for determining the reasonableness of an attorney's fee award under a state fee-shifting statute. "Defendant has not demonstrated that the California Legislature intended or intends federal standards to apply to limit the trial

fee award unless the statutory authorization for the award provided for another method of calculation. As no other method of calculation was provided for here, the trial court was required to utilize the lodestar method.

## B. *Denial of Postoffer Fees*

Plaintiff argues that the trial court's calculation was not based on the lodestar method but was instead an arbitrary decision that attorney's fees incurred by plaintiff after defendants' December 1993 settlement offer had not been reasonably incurred and therefore were not recoverable.[11] As we have already noted, the lodestar method vests the trial court with the discretion to decide which of the hours expended by the attorneys were "reasonably spent" on the litigation. (*Serrano v. Unruh, supra,* 32 Cal.3d at pp. 633, 635, 639.) The lodestar amount is the product of the number of hours "reasonably spent" and the reasonable rate. In this case, the trial court found that the hours expended after the December 1993 oral settlement offer were not "reasonably spent" on the litigation because plaintiff could have obtained all of the relief he ultimately achieved, and more, by accepting that offer. Hence, plaintiff's attorneys achieved nothing by continuing to expend their time after that offer. The trial court's decision came within the lodestar framework because it was based on the court's assessment of whether the hours which plaintiff's attorneys claimed to have expended on this litigation were "reasonably spent."

Plaintiff contends that the court's use of the oral settlement offer as a "fees cut-off" was invalid because it "subverted the public policy underlying [Code of Civil Procedure] § 998." "Section 998 clearly reflects this state's policy of encouraging settlements. . . . In order to encourage parties to accept reasonable settlement offers made pursuant to the section, subdivisions (c) and (d) of section 998 afford the offeror a remedy against a party who has failed to accept a *statutory* settlement offer that proves to be

court's exercise of discretion in calculating the amount of reasonable attorney fees under California fee-shifting statutes generally . . . . [In fact,] the Legislature appears to have endorsed the *Serrano III* method of calculating fees, except in certain limited situations." (*Flannery v. California Highway Patrol, supra,* 61 Cal.App.4th at p. 646.) As the federal and state standards both require a consideration of whether hours spent were "reasonably expended" and permit reduction of the amount sought where the request is excessive, the question of whether these fees were awarded under the state or federal standard need not be resolved. (See fn. 6, *ante.*)

[11]Plaintiff argues that the court also erred in basing its award on a comparison of the fee award to the damages award. Since the court stated a primary basis and an alternative and independent basis for its award, the alleged invalidity of its alternative basis does not invalidate the award unless the primary basis was invalid. Since we find the primary basis valid, we do not address the validity of the alternative basis.

reasonable." (*Poster* v. *Southern Cal. Rapid Transit Dist.* (1990) 52 Cal.3d 266, 270 [276 Cal.Rptr. 321, 801 P.2d 1072], citations omitted, italics added.) Basically, Code of Civil Procedure section 998 provides that a plaintiff who failed to accept a defendant's statutory offer and "fails to obtain a more favorable judgment" will be denied recovery of his or her postoffer costs *and* must pay the defendant's postoffer costs. (*Poster* at p. 270.) Statutory attorney's fees are an element of costs. (Code Civ. Proc., § 1033.5, subds. (a)(10)(B), (c)(5).)

 Code of Civil Procedure section 998 (hereafter section 998) was not applicable in this case, and the trial court did not purport to apply it. Defendants' December 1993 oral settlement offer was not a statutory settlement offer because it did not comply with the requirements of section 998. However, the inapplicability of section 998 did not prevent the trial court from allowing the underlying policy concerns addressed by that section to guide its exercise of its discretion in this case. The basic premise of section 998 is that plaintiffs who reject reasonable settlement offers and then obtain less than the offer should be penalized for continuing the litigation. The harsh result of section 998 is that the plaintiff not only loses the right to recover his or her costs, but must also pay the defendant's postoffer costs. The trial court had no authority in this case to require plaintiff to pay defendants' costs. It did, however, have the discretion to decide whether attorney time spent after defendants' December 1993 settlement offer was time "reasonably spent."

We do not believe that the trial court's decision was arbitrary or irrational in this regard. Plaintiff relies on federal cases which state that a trial court may not use an informal settlement offer as a basis for determining, in its discretion, the amount of a reasonable attorney's fee award. He chiefly relies on *Ortiz* v. *Regan* (2d Cir. 1992) 980 F.2d 138. Ortiz brought an action in which she claimed that she had been deprived of notice and a hearing before her pension benefits were suspended. The district court denied Ortiz her attorney's fees for attorney time spent after the defendant offered to hold a postdeprivation hearing. The Second Circuit held that denying Ortiz her postoffer attorney's fees was improper because ". . . Ortiz's [postoffer] litigation efforts vindicated her pre-deprivation due process rights even though a post-deprivation remedy was available." (*Ortiz* at p. 140.) The appellate court pointed out that the district court had explicitly found that the offered postdeprivation hearing "did not satisfy [Ortiz's] pre-deprivation due process rights." (*Ortiz* at p. 139.) The appellate court concluded that this explicit finding was inconsistent with the district court's denial of attorney's fees for postoffer litigation. (*Ortiz* at p. 140.) "If attorney's fees are not

provided in situations such as this one, there would be no incentive for private citizens to challenge pre-deprivation due process violations where a post-deprivation remedy exists." (*Ibid.*)

The Second Circuit also found that there was "[a] second problem" with the district court's denial of postoffer attorney's fees. (*Ortiz* v. *Regan, supra,* 980 F.2d at p. 140.) "A district court should not rely on informal negotiations and hindsight to determine whether further litigation was warranted and, accordingly, whether attorney's fees should be awarded. Otherwise, plaintiffs with meritorious claims may be improperly dissuaded from pressing forward with their litigation." (*Ortiz* at pp. 140-141.) The court pointed out that the defendant could have made a formal settlement offer under rule 68 of the Federal Rules of Civil Procedure (28 U.S.C.). Rule 68, like section 998, mandates that a party who rejects a formal settlement offer and then obtains a less favorable result must pay both its own and the adverse party's postoffer costs. (Fed. Rules Civ.Proc., rule 68, 28 U.S.C.) Citing *Cowan* v. *Prudential Ins. Co. of America* (D.Conn. 1990) 728 F.Supp. 87, the Second Circuit stated that "[a]bsent a showing of bad faith, 'a party's declining settlement offers should [not] operate to reduce an otherwise appropriate fee award.' " (*Ortiz, supra,* at p. 141.)

*Cowan* was a district court opinion in which the district court declined, in its discretion, to base a reduction of an attorney's fee award on the plaintiff's rejection of an informal settlement offer which exceeded his ultimate recovery. (*Cowan* v. *Prudential Ins. Co. of America, supra,* 728 F.Supp. at p. 92.) "I do not believe that a party's declining settlement offers should operate to reduce an otherwise appropriate fee award. The very existence of Rule 68, with its precise requirements, creates a negative implication as to offers of settlement that do not comply with its terms. Moreover, it is not clear that a rule barring all attorney's fee awards for post-offer work where the ultimate judgment is below the offer would be consistent with Congress's purpose of creating incentives to the bringing of meritorious civil rights claims. A rule giving trial judges discretion to deny such fees where the refusal of an offer is shown after the fact to have been unwise might well lead to very uneven results and even misuse in cases in which judges become involved in settlement negotiations. It may be that our legal system badly needs a mechanism to encourage early settlement, but that mechanism ought to emerge either from the rule-making process or directly from Congress." (*Cowan, supra,* at p. 92.)

The Fourth Circuit (*Clark* v. *Sims* (4th Cir. 1994) 28 F.3d 420, 424) and the Tenth Circuit (*Cooper* v. *State of Utah* (10th Cir. 1990) 894 F.2d 1169,

1172) have also stated that a district court may not reduce fees in reliance on a plaintiff's rejection of an informal settlement offer. The Fourth Circuit relied on *Ortiz*, while the Tenth Circuit's opinion contained no analysis of this issue but simply the blunt statement that ". . . downward adjustment of fees based on settlement negotiations is not well-founded." (*Cooper* at p. 1172.)

Defendant asks us to reject these federal cases. We conclude that these federal cases do not persuasively justify their conclusion. Only *Cowan* contains substantial analysis of the issue. While the concerns expressed by the district court in *Cowan* are not invalid, we do not believe that these concerns merit restricting a California trial court's discretion to consider all of the facts and the entire procedural history of the case in setting the amount of a reasonable attorney's fee award. The existence of section 998 does not, in our view, imply that its inapplicability in a particular case prevents a trial court from considering a nonstatutory settlement offer in determining the amount of a reasonable attorney's fee award. Consideration of a nonstatutory settlement offer by a trial court where appropriate does not involve the creation of a "rule" similar to section 998 but without its precise requirements. Instead, a trial court operating within its discretion is simply empowered to take into consideration the fact that a party continued to litigate a matter after a reasonable, albeit informal, settlement offer. Although it involved a rule 68 of the Federal Rules of Civil Procedure (28 U.S.C.) formal settlement offer, the United States Supreme Court's reasoning in *Marek* is applicable here. "In a case where a rejected settlement offer exceeds the ultimate recovery, the plaintiff—although technically the prevailing party—has not received any monetary benefits from the postoffer services of his attorney." (*Marek* v. *Chesny* (1985) 473 U.S. 1, 11 [105 S.Ct. 3012, 3017, 87 L.Ed.2d 1].) Attorney time spent on services which produce no tangible benefit for the client is not time "reasonably spent."

California courts have long held that trial courts have broad discretion in determining the amount of a reasonable attorney's fee award. This determination is necessarily ad hoc and must be resolved on the particular circumstances of each case. Section 998 was enacted to facilitate California's policy of encouraging parties to accept reasonable settlement offers. (*Poster* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 52 Cal.3d at p. 270.) This policy is not inconsistent with permitting a trial court to consider informal settlement offers in cases where section 998 does not apply and the trial court has the discretion to set the amount of a reasonable attorney's fee award. We are confident that our trial courts are capable of avoiding "uneven results," and we can see no justification for *Cowan*'s belief that "misuse" is a significant

danger. California trial courts regularly exercise their discretion to determine what is reasonable under particular circumstances. This situation is not so rife with potential for abuse that we cannot trust our trial courts to continue to exercise their discretion in the interests of fairness and justice. Consequently, we do not believe that prohibiting trial courts from considering informal settlement offers in setting the amount of a reasonable attorney's fee award is warranted.

Plaintiff argues that the December 1993 settlement offer was not a "true offer" because its terms were so uncertain that the offer could not have been accepted and enforced. The evidence before the trial court established that the terms of this offer were sufficiently certain. The offer specified the precise terms of the compensatory element, the injunction, the costs component and the attorney's fees component. The terms of the offer differed from the previous formal written offer in only two particulars. First, instead of the $15,000 compensatory payment offered in the November written offer, the December oral offer substituted a compensatory element of two quarters of paid leave not charged to sabbatical. Second, the offered injunctive relief was modified to require not only Lease but also the Regents not to retaliate against plaintiff. We do not detect anything remotely uncertain in these terms. Plaintiff's attorney evidently comprehended these terms to be an offer since he characterized them as such in his letter to defendant's attorney written on the date of the December offer.[12] Plaintiff attempts to reargue the disputed factual issues which were resolved by the trial court. Since substantial evidence supports the trial court's findings, we have no authority to disturb them. (*Reddy* v. *Gonzalez* (1992) 8 Cal.App.4th 118, 123 [10 Cal.Rptr.2d 55].)

Plaintiff contends that the trial court's comparison of the offer to the judgment was erroneous. First, he claims that the court erred in concluding that the leave offer was more favorable than the $27,500 judgment. Defendants established below that the pretax value of the leave offer was $44,495.54. The trial court took the relevant tax considerations into account in comparing the leave offer to the monetary component of the judgment. There was nothing "hypertechnical" or "inherently speculative" about the trial court's comparison. Because a portion of the judgment was nontaxable, the trial court properly accounted for that distinction in comparing the two amounts. Although plaintiff hotly disputed the court's conclusion, the record contains substantial support for the court's finding that leave offer was more favorable to plaintiff than the monetary component of the judgment.

---

[12]Thus, we also reject plaintiff's claim that the trial court could not have found "that an oral offer was made here." Plaintiff's attorney acknowledged in this letter that an offer was made. This supports the trial court's finding.

Second, plaintiff maintains that the court's comparison of the judgment's injunctive relief to the injunctive relief component of the December 1993 offer was invalid.[13] The record supports the court's finding. The injunctive component of the December offer would have ordered Lease not to violate plaintiff's rights or retaliate against him and ordered the Regents to comply with the IPA, remove the offending letter from all UCSC files and not retaliate against plaintiff. The judgment's injunctive relief ordered the Regents and Lease not to violate the IPA and not to violate plaintiff's rights or retaliate against him. The record supports the trial court's conclusion that the injunctive relief offered in December 1993 was equivalent to or better than the injunctive relief obtained by stipulation in the judgment.

Plaintiff takes issue with the trial court's finding that his lawsuit did not have a "catalytic effect." He asserts that the "catalytic effect" achieved by his lawsuit justified the expenditure of his attorneys' time in litigating it. ■ The catalytic effect of a lawsuit can be a "factor" in setting the amount of a reasonable attorney's fee award because it is pertinent to "the extent of success" achieved by the lawsuit. (*Kilgour v. City of Pasadena* (9th Cir. 1995) 53 F.3d 1007, 1011, fn. 4.) The "degree of success" is one of the factors that a trial court should consider in setting the amount of a reasonable attorney's fee award. (*Hensley v. Eckerhart, supra*, 461 U.S. at p. 436 [103 S.Ct. at p. 1941].) ■ The trial court found that plaintiff's action had not been a catalyst for reform of UCSC's faculty disciplinary process. It concluded that plaintiff's case had merely been a subject of ongoing "discussion" and "debate" about this process which had begun prior to plaintiff's lawsuit. The evidence supports the court's findings. While the *events* upon which plaintiff founded his action were one of the ingredients in the UCSC

[13]Plaintiff maintains that the trial court's comparison of the offer to the judgment "fails to give due regard to the discovery, reputational vindication, institutional reform and public debate benefits achieved by plaintiff." Since the court found that plaintiff's lawsuit resulted in no reform and did not significantly contribute to debate, these factors were nonexistent. There was no reason to doubt that a judgment based on the offer would have vindicated plaintiff's reputation as cleanly as, and far more expeditiously than, the judgment. As the alleged value of the "discovery" plaintiff "achieved" during his lawsuit was disputed, the trial court could have concluded that this discovery had no real value to plaintiff.

In his reply brief, plaintiff claims that the offer was not comparable to the judgment because it would have placed at risk his entitlement to his attorney's fees and costs because the leave offer was worth less than the $25,000 jurisdictional minimum necessary for a superior court action. Because this claim is raised for the first time in plaintiff's reply brief without any showing of good cause for plaintiff's failure to raise it earlier, we need not address it. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770].) However, since the evidence strongly supported the trial court's finding that the leave offer was worth more than the judgment, and the judgment exceeded this jurisdictional minimum, the trial court did not err in implicitly concluding that plaintiff's right to recover his fees and costs would not have been imperiled by acceptance of the December 1993 offer.

debate about the faculty disciplinary process, substantial evidence supported the trial court's decision that plaintiff's *lawsuit* did not significantly impact this debate or result in any changes in this process.

The trial court's conclusion that the December 1993 offer would have afforded plaintiff as good or better relief than the judgment is supported by the evidence. Taking this fact into consideration in setting the amount of a reasonable attorney's fee award was not improper. Because the evidence was in dispute as to whether or not plaintiff's action had had a catalytic effect, the court did not err in concluding that it had not had such an effect and dismissing catalytic effect as a factor in the calculation of the appropriate attorney's fee award. The trial court's calculation of the attorney's fee award used the correct methodology and did not involve any abuse of the court's broad discretion.

### C. Denial of Fees Incurred in Fees Litigation

The trial court awarded plaintiff no attorney's fees for the work performed by his attorneys in litigating his request for attorney's fees. "Prevailing parties are compensated for hours *reasonably* spent on fee-related issues. *A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether.*" (*Serrano* v. *Unruh, supra*, 32 Cal.3d at p. 635, original italics omitted and italics added.) The trial court found, on substantial evidence, that plaintiff's fee request was unreasonably inflated. In this case, where plaintiff's attorneys attempted to justify more than $500,000 in fees for a case which achieved a modest financial award and stipulated injunctive relief which required defendants to do little, if anything, more than obey the law in the future, the trial court did not abuse its discretion in concluding that the attorney's fees incurred in attempting to justify this unreasonable request were not hours "reasonably spent" on the fee litigation. Hence, the trial court was permitted to deny plaintiff any recovery for attorney's fees incurred in the fee litigation.

### D. Denial of Fees for Postjudgment Motions

Plaintiff argues that the trial court was required to award him his attorney's fees for plaintiff's opposition to defendants' postjudgment motions to seal court files and for sanctions. He claims that this work was necessary to achieve the results he sought in this litigation.

"Compensable work on post-judgment proceedings must be 'useful' and of a type 'ordinarily necessary' to secure the litigation's final result."

(*Stewart* v. *Gates* (9th Cir. 1993) 987 F.2d 1450, 1452.) While it is clear from the record that plaintiff desired full disclosure of all documents, his desire was not "ordinarily necessary" for him to secure the result obtained in this litigation. The underlying conduct for which plaintiff sought recompense was the wrongful *disclosure* of information about him by defendants. Although plaintiff prevailed on the motion and the trial court denied defendants' postjudgment request that the court files be sealed, it did so because the documents had already been in public files for some time and therefore could not be considered confidential. It did not find that disclosure of these documents was proper or appropriate. In fact, some of those documents were similar to those which plaintiff's action claimed had been wrongly disclosed. These documents simply contained information about individuals other than plaintiff.

The trial court did not abuse its discretion in concluding that the time spent by plaintiff's attorneys opposing these motions was not "necessary" for plaintiff to secure the result obtained in this litigation.

## CONCLUSION

The trial court's order is affirmed.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied November 23, 1998, and appellant's petition for review by the Supreme Court was denied January 20, 1999.